# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

DAVID BOWERS,

           Plaintiff,

      v.                                        Case No. 07-C-1

WILLIAM POLLARD, et al.,

           Defendants.

---

## DECISION AND ORDER

---

Plaintiff David Bowers brought this action under 42 U.S.C. § 1983, alleging that the conditions of his confinement at Green Bay Correctional Institution ("GBCI") violated the Constitution. The defendants include GBCI Warden William Pollard, GBCI Security Director Peter Erickson, Supervising Officer William Swiekatowski, social worker Mark Zimonick, Corrections Program Supervisor Sarah Cooper, and GBCI licensed psychologists Todd Hamilton and Martha Breen-Smith. (Def.'s PFOF 3-9.) Bowers' *pro se* complaint was screened pursuant to 28 U.S.C. § 1915A, and he was permitted to proceed on Eighth Amendment and due process claims stemming from the conditions of his confinement under a Behavior Action Plan imposed by prison officials. After both sides moved for summary judgment, I determined that Bowers should receive appointed counsel. Following discovery and a new round of briefing, I now conclude for the reasons that follow that the defendants are entitled to summary judgment on all claims.

# I. BACKGROUND

Bowers arrived at GBCI on the evening of November 14, 2005 shortly before 9:00 p.m. He had been transferred from Dodge Correctional Institution ("DCI") where he had been placed in restraints to prevent him from inserting objects into his penis. (Aff. of Heather Y. Fong, Ex. F, DOC 002762.) Following his arrival at GBCI, Bowers was placed in Observation Status. According to Wisconsin Department of Corrections regulations, Observation Status is a "nonpunitive status to be used for the temporary confinement of an inmate to ensure the inmate's safety and the safety of others if the inmate is mentally ill and dangerous, dangerous to himself or herself, has a medical problem that requires separation from the population for treatment, or refuses testing for a communicable illness." Wis. Adm. Code § DOC 311.01. The conditions in Observation Status are intended, insofar as possible, to mirror those in the status from which the inmate came prior to the observation placement, except that privileges and property may be withdrawn if the staff reasonably believes that they will be used by the inmate to harm himself or another. § DOC 311.14(1)(a).

A November 11, 2005 Psychological Services Report from DCI notes that Bowers was currently serving fifteen months following the revocation of his extended supervision on a conviction for delivery of cocaine. (Fong Aff., Ex. F, DOC 002794.)[1] Bowers had been transferred to DCI from Milwaukee Secure Detention Facility ("MSDF") because of self-abusive behavior.

---

[1]Counsel for Bowers has objected to many of the defendants' Proposed Findings of Fact (Def.'s PFOF) on the ground that they are unsupported by admissible evidence. More specifically, counsel challenges the institutional records on which the defendants rely for many of the facts they have proposed. I am satisfied that the records are admissible under Fed. R. Evid. 803(6) in that they are records of regularly conducted activities by the Wisconsin DOC. *See Wheeler v. Sims*, 951 F.2d 796, 802 (7th Cir. 1992). I further note that most of the DCI records cited herein, like the DCI report referenced here, have been submitted by counsel for Bowers.

2

(*Id.*, DOC 002763.) The DCI report reveals that Bowers also had several previous placements at the Wisconsin Resource Center ("WRC"), most recently in May of 2005. WRC is the only mental health facility to which inmates in the custody of the DOC can be referred. (Pl.'s PFOF ¶ 15.) Although Bowers' Presentence Investigation Report indicated that he had reported auditory and visual hallucinations in the past, a 1993 psychological evaluation described him as "certainly not an individual who is mentally ill or intellectually incompetent . . . ." (Fong Aff., Ex. F. at DOC 2795.) Instead, the 1993 evaluation described Bowers as "an emotionally disturbed individual, one with a rather erratic pattern of emotional shifts and impulsive behavior, along with a rather poor socialized perspective, . . . one who would, as he admitted himself, be quite unpredictable, often a poor monitor of his own behavioral inclinations." (*Id.*) A 1995 evaluation also found "no indices of hallucinations or delusions" and noted that Bowers in general "offered typical symptomatology for Disruptive Behavior Disorder." (*Id.*)

Later diagnoses that appear in DOC records include Psychotic Disorder, Intermittent Explosive Disorder, and Polysubstance abuse, (February 12, 2002 Care Plan, Fong Aff., Ex. F. DOC 003003-05); and Schizoaffective Disorder/Intermittent Explosive. (May 23, 2003 Psych. Services Client Contact form, Fong Aff., Ex. F. DOC 2950.) In a November 7, 2005 report of an evaluation to determine whether Bowers was competent to proceed in his revocation, Psychiatrist Eric D. Knudson diagnosed Bowers as having Bipolar Disorder with psychotic features. (*Id.*, Ex. J. at 2.) Dr. Knudson nevertheless concluded that Bowers was competent to proceed, noting that despite his self-injurious behavior, he continued to demonstrate self-serving motivation with respect to his defense. Bowers indicated he would be able to remain in control, but predicted that he would engage in disruptive behavior in the institutional setting and perhaps even in the courtroom if he felt disrespected. Dr. Knudson believed Bowers' comments did not represent an active symptom of his

3

mental illness, but were rather more indicative of manipulative behavior. In order for Bowers to retain his present abilities, however, Dr. Knudsen noted it was important that he continue to receive psychiatric treatment and monitoring to assure compliance with medications. (*Id.* at 3.) The November 11, 2005 DCI report also noted that Bowers had exhibited "quite a bit of manipulative behavior both to get to and from WRC when the situation becomes aversive for him." (Fong Aff., Ex. F. at DOC 002795.) The same report indicated that Bowers was being maintained on Seroquel, Cogentin, Prozac, Trazodone, Ativan and Haldol. (*Id.*)

On November 9, 2005, DCI requested an urgent transfer of Bowers back to WRC, noting that he had recently swallowed a handful of pills and then refused medical treatment, placed teeth from a comb into his urethra, and smeared feces. (*Id.*, DOC 002801.) WRC, however, refused to accept him. Observing that Bowers' self-harming behavior is "manipulative and not psychotic," Jeffrey Heise, Admissions Coordinator-Unit Supervisor at WRC, stated in a November 10, 2005 email that Bowers had engaged in the same behavior at MSDF in order to get to WRC (which he did), and that sending him to WRC at that point "might be the poison and not the cure." (*Id.*, DOC 003111.) It was apparently at that point that the decision was made to transfer Bowers to GBCI.

On November 15, 2005, the day following his arrival, GBCI Psychologist Todd Hamilton met with Bowers and noted that he had been loud and defiant on his arrival, announcing that "Bowers is in the house" and they would have to deal with him. (*Id.*, DOC 002763.) He had refused orders to strip and put on a "seg" smock.[2] (*Id.*, DOC 002762.) Dr. Hamilton ordered that Bowers

---

[2]A seg smock "is a one-piece item of clothing much like a poncho which covers a person from chest to below the groin." *Gillis v. Litscher*, 468 F.3d 488, 491 (7th Cir. 2006). It is designed so as to be difficult to destroy or to use to hang oneself. (Fong Aff. Ex. D, Dep. of Sarah Cooper at 46.)

4

continue in Observation due to the threat of injury to himself until he displayed stable emotional behavior. (*Id.*)

On November 16, 2005, GBCI Psychologist Martha Breen-Smith met with Bowers and noted he was alert, oriented and coherent. (Aff. of Martha Breen-Smith, Ex. A, at 000324.) Bowers, who was dressed in a paper suicide gown, stated he felt cold. (*Id.*; Compl., VI, A.) He denied any suicidal ideation or thoughts of self-harm, but stated that unless released from Observation, he would be her "nightmare." (Breen-Smith Aff., Ex. A, at 000324.) Dr. Breen-Smith ordered Bowers continued on Observation, telling him that he needed to be cooperative and stable to get off Observation Status. (*Id.*) Dr. Breen-Smith saw Bowers again the following day, and he was loud and demanding, insisting that he be given specific property and medication. Bowers again warned Dr. Breen-Smith that "you'll have problems with me," and made vague threats to harm himself or others. Based on his threats, Dr. Breen-Smith ordered continued Observation. (*Id.*, at 323.) When Dr. Hamilton saw Bowers on November 18, he was shivering and cold. Dr. Hamilton ordered that he be given a mattress and smock immediately and a blanket after lunch. Bowers admitted that he had smeared feces, but that he was now going to try to maintain his behavior. (Aff. of Todd Hamilton, Ex. A at 000322.) By November 21 he had become more compliant, and Dr. Breen-Smith released him from Observation Status. (Def.'s PFOF ¶ 34.)

The same day, the Segregation Review Committee placed Bowers on a Behavior Action Plan ("BAP") due to his harm to himself, as well as his threats to harm himself and others. The BAP consisted of restrictions on Bowers' property which are authorized under Wis. Admin. Code § DOC 303.69 for inmates placed in segregation. (*Id.* at ¶¶ 35-36.) The restrictions authorized under § DOC 303.69, however, are limited. The institution must provide the inmate a cell with adequate

5

lighting, a clean mattress, sanitary toilet and sink, and adequate ventilation and heating. Wis. Admin. Code § DOC 303.69(1). The inmate is also required to have access to clothing, toothbrush, writing materials, holy books, etc. Wis. Admin. Code § DOC 303.69(2).

The particular conditions imposed by Bowers' initial BAP were set forth in a letter from Warden Pollard to Bowers. (Pollard Aff., Ex. A at 509.) Bowers' cell would be searched twice per week; he would be fed with a "bag meal"; clothed with a "seg smock"; and would be allowed outside his cell for two hours per week to write correspondence and two hours for clinical or group therapy. (*Id.*) Sanitary materials, such as toothbrush and soap, would be provided upon request, and he would be allowed to shower on "regular shower days." (*Id.*) No changes were to be made without the approval of Supervising Officer Lieutenant Swietkatowski, Program Supervisor Cooper, and either or both Dr. Breen-Smith and Dr. Hamilton. In his letter to Bowers, Pollard emphasized that the BAP was subject to ongoing review, and that modifications would be made "as appropriate, to include giving you more property and privileges as your behavior stabilizes, or taking more privileges and property if you become unstable." (*Id.*)

Bowers, however, did not conform his behavior as GBCI administrators had hoped. The day after the BAP began, November 22, Bowers was angry when staff returned him to his cell after his two hours of outside writing time had expired. He then blocked his cell door from the inside using his mattress and removed feces from his toilet and smeared it on the windows, explaining that he would stop if they allowed him more time for writing. He then covered his cell window with feces, preventing staff from observing him. This required a cell extraction, after which Bowers was placed in another cell, strip searched and showered. While staff were removing his restraints, Bowers resisted and tried to assault them, resulting in his placement in Observation and prompting another

6

visit with Dr. Breen-Smith. (Def.'s PFOF ¶¶ 40-8.) Dr. Breen-Smith noted in her report that after he was returned to his cell, Bowers had tried to shred a towel and pull down the sprinkler head. He then covered the window with feces and threatened to kill himself. She states she was called after he made a minor cut on his arm and smeared blood on the door. Dr. Breen-Smith notes that when she spoke with him he had calmed and cleaned his cell, and the nurse was called. Bowers explained that he was angry at not getting more writing time. He agreed not to hurt himself further, but warned that he would harm himself in the future if he was not given more property. Dr. Breen-Smith ordered continued Observation and authorized a gown and mattress. (Breen-Smith Aff., Ex. A, 000320.)

The next day, November 23, Bowers was given a blanket but told it could be taken away if he misused it. Later that day, Bowers returned to his disturbing pattern of inserting various materials into his penis, this time a toenail, and parts of a milk carton and his mattress. (Def.'s PFOF ¶¶ 50-51.) After threatening to use an M-26 air Taser, Bowers complied with staff orders and was placed in five-point RIPP restraints until sufficient staff arrived to transport him to the local hospital to assess the extent of his self-inflicted injuries.[3] Upon his return from the hospital, Bowers was placed back in Observation. The following day he was given a paper gown, but no seg mattress and blanket because of his continued threats and efforts to use such items to harm himself. (*Id.* ¶¶ 52-55.) Dr. Breen-Smith continued to monitor Bowers while he remained in Observation. On November 25, he was initially calm, but became angry and agitated when she told him he would not get a blanket or mattress because he had misused them. He swore, banged the door and refused to

---

[3]Five-point RIPP restraints are used to restrain inmates who are a danger to themselves or others. The inmate is lain on a padded bench-like apparatus, and his limbs and torso are restrained with nylon straps that are secured with velcro. (Def.'s PFOF ¶ 14, Fong Aff., Ex. G, M, and N.)

7

speak to her further. Dr. Breen-Smith ordered a new paper gown and authorized a segregation smock if his behavior was appropriate. (*Id.* ¶ 56.) On November 26, Bowers was given a seg smock, and on November 28, Dr. Breen-Smith found him to be calm and cooperative. His speech was clear and coherent, he denied hallucinations or thoughts of self-harm or harm to others. Based on her assessment of his condition, Dr. Breen-Smith ordered Bowers released from Observation. (Id. ¶P 58-59.)

Prison officials continued to review Bower's BAP throughout December, and his behavoir seemed to improve. On December 8, he was issued a seg blanket and seg clothing instead of his seg smock. (Pollard Aff., Ex. A at 515.) He was also allowed more personal items in his cell, including writing materials. Things deteriorated substantially in January 2006, however, in what the defendants describe as "a very bad month." (Def'.s Br. Supp. S.J. Mot. at 7.)

On January 1, 2006, Bowers held open the trap door to his cell after giving up his meal tray. He placed an unknown object in the key hole to the trap so that it could not be locked. Officers were called to remove Bowers to an observation cell so the door could be repaired. After initially refusing, Bowers entered the cell but within minutes produced a radio ear plug that he refused to surrender. As staff prepared to enter the cell to forcibly take it, Bowers began breaking the ear plug apart and threatening to injure himself with it. He also attempted to jam the lower trap door lock to the inner door with a piece of it. When staff threatened to administer an incapacitating agent ("OC") if he did not comply with their directions and hand the ear plug over, Bowers responded "F- - - that, I'm going to break this apart and hurt myself with this mother-f- - - er – come in and get it from me." (Aff. of William Pollard, Ex. E.) Bowers then began scooping water out of the toilet and onto the floor so that if an entry team entered they would be unable to get traction and would

8

slip on the floor. After obtaining the required approval, staff administered a one-second burst of OC, striking Bowers in the chest area, and closed the trap. Staff then waited several seconds for the agent to take effect and directed Bowers to come to the door. At that point Bowers complied and was taken to another cell. (*Id.*)

On January 3, when the officer passing out medications opened the trap on Bowers' door to hand him his, Bowers grabbed a handful of feces from the floor of his cell. When the officer stepped back to avoid being hit with it, Bowers reached out, grabbed the medication cart and pulled it closer to his cell. He then opened the drawer, removed the medications intended for other inmates and began ingesting them by the handful. (*Id.*, Ex. F.) After initially refusing to come to the door so he could be handcuffed, Bowers complied when staff threatened him with a Taser. Restraints were then applied, and he was cleaned off in the shower and transported to the emergency room at the local hospital. (*Id.*) Upon his return, Bowers was placed in Observation, where he remained until January 9. (Def. PFOF ¶ 66.)

Following his release from Observation on January 9, Bowers again began inserting objects into his penis and smearing feces. He was placed in RIPP restraints and then returned to Observation. When visited by Dr. Breen-Smith, he told her he was "chillin," laughed at the placement, and claimed his behavior was the fault of the staff. (Pollard Aff., Ex. A at 000309.) He became angry and called Dr. Breen-Smith a bitch, however, when she told him could have a smock but not a blanket at this time. Dr. Breen-Smith directed that Bowers remain on Observation and stated he could be given a blanket that evening if he appeared stable. (*Id.*) On January 11, while still in Observation, Bowers inserted an orange peel into his penis, flooded his cell, banged his head, split his lip, and smeared feces. (*Id.* at 000307.) He was placed in RIPP restraints and cleaned up,

9

at which time it became apparent that he had smeared blood from his lip onto his head so that it appeared he had struck his head too. (*Id.* at 000470.) After he was returned to Observation he informed Dr. Breen-Smith that he planned to keep up his behavior until January 17, when he believed he would be released. (*Id.* at 000307.)

Bowers was released from Observation on January 15, and on January 19, his BAP was modified so that he was allowed to have socks. (DPFOF ¶¶ 68-69.) On January 25, however, he was again taken to the hospital after he placed pieces of his mattress, milk cartons and chewed off finger nails into his penis. (Pollard Aff., Ex. A, 000303.) Upon his return, he was given a paper gown and returned to his cell. As he entered, he removed a piece of a milk carton from the track of the door and again attempted to place it in his penis. After officers had suited up to enter his cell and he was threatened with a Taser, he complied with staff directions and turned the cardboard piece over. (*Id.* Ex. G.) The following day, he was returned to the hospital for evaluation and treatment for injuries sustained from repeatedly banging his head on the wall. (Pollard Aff., Ex. A at 000301.) After he was placed in the van for transport to the hospital, Bowers unfastened his safety belt and threatened to be disruptive on the way. A Band-it (presumably, a stun belt) was placed on him to insure compliance. (*Id.*, Ex. H.)

Despite these outbursts, Bowers was released from Observation on January 30, and his BAP was modified to allow a regular blanket in addition to the segregation blanket. (DPFOF ¶¶ 71-72.) In February, he was allowed underwear, a regular meal tray, and paper property in his cell after an apparently calm couple of weeks. (*Id.* ¶¶ 73-74.) Nevertheless, on February 26 he smeared feces on a guard while attempting to wrest the medicine cart away from him. (*Id.* ¶ 75.) In early March, he was returned to Observation after threatening to harm himself by inserting objects into his penis

10

and not eating or drinking. He was given a seg mattress, smock and blanket. (*Id.* ¶ 76.) On March 8, he was taken to the hospital after he bit his own arm. When he returned he was placed in restraints on several occasions due to his continued threats of self-harm. On March 12, he was returned to Observation after he inserted a pen insert (presumably the inner ink-containing portion of a ball-point pen) and pieces of his mattress into his penis. (*Id.* ¶¶ 77-81.) He was released from Observation on March 15, but on March 20 he attempted to overdose on medication he took from the medication cart. This required another trip to the hospital. On March 29 he banged his head on the wall and then removed the bandage from his head and attempted to put it in his penis. Several days of restraints ensued throughout early April. (*Id.* ¶¶ 81-84.)

On April 12, Bowers' BAP was modified again to impose more stringent conditions. For instance, he was returned to bag meals and was denied milk in light of his efforts to place parts of the milk carton into his penis. Moreover, any threat or attempt at self-harm would result in immediate placement in five-point restraints. If an attempt was successful and necessitated a trip to the hospital, Bowers was to be placed in restraints immediately upon his return. (*Id.* ¶ 88.) On April 28, the BAP was modified to allow regular meals and more personal items in Bowers' cell. (*Id.* ¶ 89.)

On May 22, however, Bowers escalated the severity of his behavior. He threatened to place a pen insert into his penis, and this prompted the use of restraints. After Bowers was released from restraints, he managed to cover up his cell window. This produced a visit from Lieutenant Lesatz, who informed Bowers that he would have to be moved to an observation cell because of his threats. Bowers replied that he didn't actually intend to harm himself but merely wanted to talk to a "white shirt" (i.e., a supervisor). Lesatz, as well as a captain and Dr. Hamilton, the psychologist, attempted

11

without success to calm Bowers down and get him to leave his cell peacefully. Bowers stated that he had gotten water on his cell floor and hoped that the extraction team would slip and fall when they came in to remove him. "I'm gonna f--- a couple of them up," he said, and "the only way I come out is if you gas me." (Erickson Aff., ¶ 78.)

When the extraction team got to his cell, Bowers was lying on the floor covered by his mattress. He continued to resist the order to place his hands behind his back. With the guards on top of Bowers, who continued resisting, Lieutenant Lesatz then found one of Bowers' legs in the tangle and used an X-26 Taser, which the defendants describe as an "intermediate" weapon. (*Id.*, ¶ 84.) This appeared to work momentarily, but another officer yelled that Bowers was biting him. Lesatz again tasered Bowers in the leg, after which Bowers stated that he gave up but was "happy" he "got your officer." (*Id.* Aff., ¶ 85.) After Bowers was under control and in his observation cell, Bowers told a nurse that he had placed a pen insert into his penis and a toothbrush in his rectum. Bowers was left in restraints and told Lesatz that "you guys can count on me smearing shit and assaulting staff. I'm back. Do you know who I am? I am David Bowers, the son of Satan."[4] (*Id.*, ¶ 93.)

Four days later, on May 26, Bowers was observed standing on his bed playing with the sprinkler head. He threatened to break it off if he was not moved down a wing. Lieutenant Swiekatowski told Bowers he would be placed in five-point RIPP restraints and ordered him to place his hands out of his cell to be restrained. Bowers immediately jumped up on his bed and snapped the sprinkler head off, causing water to flow freely into his cell from the ceiling. (DPFOF

---

[4]The record shows that Bowers had made similar comments to mental health professionals in the past. *See, e.g.,* Doc. # 45-3, June 20, 2007 Aff. of David Bowers, Ex. B. ("My daddy's name is Satan.").

12

¶¶ 119-121.)  With prison staff standing at his cell door ordering Bowers to submit to restraints, and after an ineffective attempt to spray Bowers with CS spray (an incapacitating agent), Bowers began attempting to place parts of the broken sprinkler into his penis.  After he was finally removed from his cell, he was taken to the hospital to have the sprinkler parts removed and was kept in restraints throughout the rest of the day.  The next day, then in a clinical observation cell, Bowers again broke his sprinkler head and attempted to insert parts of it into himself.  (*Id.* ¶¶ 120-31.)  On May 31 he was released from Observation.  (*Id.* ¶ 131.)

For a brief spell in June after a relatively calm period, Bowers' BAP was modified to allow a regular mattress and meal tray; these were soon disallowed, however, after Bowers spat on and punched a correctional officer.  (*Id.* ¶ 136.)  By July 2006 Bowers was again allowed paper and a seg mattress in his cell, and subsequent conditions of confinement are not at issue here.

## II.  ANALYSIS

### A. Eighth Amendment

Bowers proceeds on an Eighth Amendment claim, as well as a Due Process claim.  The Eighth Amendment is generally understood to prohibit "punishments which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain," . . . . or are grossly disproportionate to the severity of the crime."  *Rhodes v. Chapman,* 452 U.S. 337, 346 (1981) (quoting *Gregg v. Georgia*, 428 U.S. 153, 171 (1976) (joint opinion); and *citing Coker v. Georgia*, 433 U.S. 584, 592 (1977) (plurality opinion)).  Punishment involves the "unnecessary and wanton" infliction of pain when it is "totally without penological justification."  *Gregg*, 428 U.S. at 183.  Conditions of confinement will be found to violate the Eighth Amendment when they fall below

13

the "the minimal civilized measure of life's necessities." *Rhodes,* 452 U.S. at 347. To prevail on his Eighth Amendment claim, Bowers must also show that the defendants possessed the requisite mental state, i.e., that they denied Bowers civilized conditions of confinement intentionally or recklessly: "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). The defendants contend they are entitled to summary judgment on Bowers' Eighth Amendment claim because the undisputed facts of the case show that he cannot prove either of the required elements of such a claim.

In opposing the defendants' motion for summary judgment, Bowers has elected not to counter the defendants' affidavits with an affidavit of his own. Instead, he has relied upon the allegations of his complaint. This is not the usual way in which a motion for summary judgment is opposed. "Because the summary-judgment motion is designed to pierce the formal allegations of the pleadings, it normally is not made or opposed on the basis of the pleadings alone." Wright, Miller & Kane, *Federal Practice and Procedure: Civil* 3d § 2722 (1998). Bowers notes, however, that his complaint is verified and contends that "[a] sworn pleading is the equivalent of an affidavit in summary judgment." (Pl.'s Br. at 2 n. 1 (citing *Ratner v. Young*, 465 F. Supp. 386, 389 (D.C. Vir. Isl. 1979). But for a verified pleading to defeat a motion for summary judgment, it must set forth sufficient facts to support a claim. *Clifton v. Miller*, No. 97-2342, 1998 WL 78992, at * 4 (7th Cir. Feb. 19, 1998). It is in this respect that Bowers' verified complaint fails as to certain aspects of his claim.

For instance, Bowers alleged in his complaint that on one occasion when he was placed in RIPP restraints he "was tied down so long with steel hand cuffs so tight on my hands [they] swelled

14

up (my hands were purple). It took 2 weeks for the swelling to heal and my hands still had 'no' feelings [sic], because of nerve damage." ( Pl.'s PFOF ¶ 62 (quoting Compl., attached page 2).) The allegation is disputed by the defendants, who note that the five-point RIPP restraints are made out of nylon and Velcro, and are padded (Def. Resp. to PFOF ¶ 62), which is confirmed by the DVDs showing Bowers being placed in the restraints. (Fong Aff., Exs. G, M and N.) More importantly, however, the complaint does not attribute the conduct to any of the defendants. Bowers does not say who placed the restraints on him in this manner or when it occurred. To recover under § 1983 a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right. *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). An official satisfies the personal responsibility requirement of § 1983 if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent. *Id.* That is, the official must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye—in short, some causal connection or affirmative link must exist between the action complained about and the official sued in order to recover under § 1983. *Id.* Bowers fails to provide such a link in his complaint.

The same is true with respect to Bowers' allegation that while in restraints, insects, or "critters", would crawl on him and bite him. (Pl.'s PFOF ¶¶ 71,72 (citing Compl. attached page 2).) This allegation is likewise disputed by the defendants who point out that officers check inmates for their safety every fifteen minutes when they are in restraints. (Def. Resp. to PFOF ¶ 72.) But even if it was not in dispute, Bowers again fails to name the officer or officers who permitted this to occur. There is no link between the condition alleged and any of the defendants he has named. Thus, this allegation also does not survive.

15

The more general conditions under which Bowers was confined for much of his time at GBCI, however, are not in dispute. These conditions include the fact that he had to sleep on a bare floor at times, was often given only a seg smock or a paper gown for clothing, was occasionally denied clothing altogether, and was subjected to the use of five-point RIPP restraints on as many as fifteen separate occasions for as long as twelve hours at a time. (Pl.'s PFOF ¶¶ 68, 69, 74, 75, 76.) While in the RIPP restraints, Bowers was not permitted any clothing, other than a towel laid across his groin, and at times urinated and defecated on himself as a result of being strapped down for so long.[5] (Id. ¶¶ 71, 79.) It is also undisputed that GBCI officers used a Taser on Bowers on May 22, 2006, and incapacitating gases were used on him on at least three separate occasions. (Id. ¶¶ 86, 87.) Although his cell was generally heated to 73 degrees, there were times when Bowers was cold. (Hamilton Aff., ¶ 70.)[6] These are the conditions that I consider in deciding whether Bowers' Eighth Amendment claim merits a trial.

———————————

[5]Although the defendants did dispute this fact in their response, the evidentiary record they reference does not support their version. Defendant Erickson testified that there have been occasions when an inmate has asked to be let up to go to use a bathroom and if he's been calm and appropriate, staff may consult with Psychological Services Unit ("PSU") or a security supervisor and may let him up at that point. Typically, however, Erickson said they put a cushion-like device around them "so if they would need to go and they would not be let up, they could go on that." (Fong Aff., Ex. E, Dep. of Peter Erickson at 43-44.)

[6]Bowers attempts to dispute defendants' assertion that it was approximately 73 degrees in his cell, but his dispute is limited to a challenge to Ericksen's testimony. The affidavit of Dr. Hamilton, who testified that the temperature was approximately 73 degrees, is not refuted by any evidence offered by Bowers. Bowers refers in his complaint to the outside temperature as being "0 degrees" (Compl. attached page 1), but that is both unsupported by any evidence (the time period was mid-November and thus unlikely to be true) and irrelevant to the temperature *inside* his cell. Moreover, he alleges that staff turned on the "air conditioning" in his cell during this period (evidently to make it even colder), but cells at GBCI do not have air conditioning. Psychologist Todd Hamilton acknowledged that he met with Bowers on November 18 when Bowers was cold, but in response Hamilton ordered a seg smock and mattress. (Hamilton Aff., ¶ 7.)

16

As the Seventh Circuit has recognized, an Eighth Amendment inquiry is naturally fact-intensive. *Gillis v. Litscher,* 468 F.3d 488, 493-94 (7th Cir. 2006). This is due not only to the need to measure the particular conditions of confinement against the Eighth Amendment's requirements, but also the requirement that those conditions must be assessed in light of the circumstances. As discussed below, what may appear cruel and unusual in one context may not be so in another. The conditions of Bowers' confinement under the BAP were undoubtedly difficult, but they also evidence the problems faced by prison staff in controlling violent inmates who pose a constant threat of harm to themselves and staff.

*Gillis v. Litscher* provides a benchmark for the analysis of an Eighth Amendment claim based on conditions of confinement. There, inmate Gillis was placed in a Behavior Modification Plan ("BMP") at Wisconsin's "Supermax" facility as punishment for his violation of a prison rule requiring inmates to sleep with their heads facing their cell doors. 468 F.3d at 493-94. Among the conditions of the BMP, at least initially, was that Gillis was given no clothing (at all) or mattress, was denied almost all human contact, and had only nominal access to hygiene items like toilet paper. The court found that a genuine issue of fact existed as to whether such conditions constituted cruel and unusual punishment.

Recently, this court denied the state's motion for summary judgment in *Holmes v. Kingston,* No. 06-C-1033. Taking the facts in favor of inmate Holmes, a paraplegic, I found that he had been denied clothing, a wheelchair and use of a necessary catheter for significant periods of time. There, the defendants had conceded the harshness of the conditions of confinement but argued that they were necessary given Holmes' predilection for self-injuring behavior. I rejected that defense (at least on summary judgment) on the grounds that there was little evidence Holmes posed a threat to

17

himself and no evidence that he could or would hurt himself with his own wheelchair or catheter, for example.

Bowers' claims differ from the above cases in several ways. First, though spartan, Bowers' conditions of confinement were generally not as harsh as either Gillis' or Holmes'. In finding against the defendants, the Seventh Circuit highlighted the fact that Gillis was forced to remain naked in his cell, was denied all human contact and had no ability to write or receive mail. Gillis alleged it was much colder in his cell than the defendants' claim of 70 degrees, and he asserted he was forced to pace around his cell at all times just to keep warm. Similarly, in this court plaintiff Holmes had alleged facts that showed he was a naked, crippled man who was forced to drag himself around the floor of his cell and was unable to urinate for extended periods of time.

In contrast, Bowers, at least when he was in his cell, was generally provided either a seg smock or a gown (unless he tore up his gown), and his cell was heated to 73 degrees. The gown provided Bowers may not have served much practical purpose, but it ensured some modicum of dignity, which is an important consideration in a case like this. *Gillis,* 468 F.3d at 494 (contrasting *Gillis* plaintiff with plaintiff in another case: "He was allowed one pair of undershorts-which, while probably not significant as to warmth, is significant as to dignity.") Moreover, Bowers was granted access to hygiene items and was allowed out of his cell some four hours per week. He was initially given a seg mattress as well, although that was removed after he began tearing it and attempting to harm himself with it. Thus, none of the salient facts disputed in *Gillis* are evident here.

Even so, the most crucial distinction between the conditions analyzed in *Gillis* and *Holmes* and this case emerges when one considers that the conditions of confinement are not to be analyzed in a vacuum but in the context of the inmate's own behavior and other circumstances. What makes

18

Bowers' case different is that his own conduct was a principal motivating factor in the imposition of the very conditions about which he now complains, a distinction which makes *Gillis* largely inapposite and *Holmes* a contrasting example. The harshest conditions of Gillis' BMP (no clothing, no mattress) were imposed after Gillis violated an arguably minor rule requiring inmates to sleep with their heads toward the cell door, and the Seventh Circuit viewed the conditions imposed as unduly harsh in light of the relatively minor infraction Gillis committed. And in *Holmes* I found little evidence that the plaintiff posed a significant risk of injury to himself such that his own wheelchair and catheter could be removed as a means of protecting him.

In contrast, there is no real dispute about Bowers' own dramatic and violent behavior. The defendants removed Bowers' mattress and other effects after he covered his cell with feces, stole medication, injured prison staff, and used his mattress to harm himself. Indeed, these conditions did not function so much as punishment, as the necessary means for Bowers' own protection. The DVDs Bowers has submitted show him to be truculent and combative during the May 22 cell extraction (prompted by a threat of self-harm followed by Bowers covering up his cell window and hiding under his mattress). During that extraction Bowers clearly resisted. He bit one of the guards trying to subdue him (the bite marks are shown at the end of the video) and punched him in the face, and this resistance prompted a brief Taser to Bowers' leg. Bowers seemed unmoved by the Taser – afterwards, while being transported and placed in restraints, he repeatedly taunted the guard he had bit and said he hoped the guards would break his wrist so he could have a successful lawsuit. (Fong Aff., Ex. G.) Other extractions and use of restraints were necessary given Bowers' continued efforts to injure himself. The videos show the guards to be exceedingly cautious and restrained with

19

him, and the RIPP restraints were clearly necessary to enable a nurse to examine his injuries and keep him from causing himself further harm.

The DVDs also show Bowers to be manipulative and antisocial. He states on more than one occasion that he was "clowning" (causing mischief) in order to obtain a transfer to the WRC or other facilities. "If I can't go back to the WRC," he said, "I'll kill myself and it's going to be all of you all's fault." He continues, "I wanna go to WRC, Unit 8, or Unit 1." (Fong Aff., Ex. M.) And, after threatening to harm himself – the threat that prompted the May 22 extraction – he protested that it was not a real threat but just an effort to get transferred. "I'm not suicidal," he said, "I'm chillin' 'cause I want to go to Portage [Columbia Correctional Institution]." (Fong Aff., Ex. G at 3:14:30.)

Where in *Holmes* there seemed little reason for the defendants to have removed Holmes' catheter, here the opposite is true: Bowers had a tendency to insert all sorts of things into himself, and so removal of his mattress and other items was clearly justified. Bowers was initially placed in Observation Status, and then on the BAP, because he had been on suicide watch at DCI and was defiant, threatening, and smeared feces upon arrival at GBCI; if anything, his subsequent behavior proved the necessity of keeping Bowers in an environment in which he could be observed and denied access to anything that he could use to hurt himself.

The necessity of evaluating the conditions of confinement in relation to the inmate's own behavior is made clear by the Seventh Circuit in *Gillis*. There, the court distinguished *Trammell v. Keane,* a case from the Second Circuit:

> certain significant distinctions exist between that case and Gillis's. Trammell's behavior was significantly more uncontrollable. In a 5-week period he was cited for 16 disciplinary violations. Gillis had only been at Supermax for 2 weeks, and the

20

rule he violated had only been uniformly enforced for about one week, before he was placed in the BMP. He had only one conduct report, and that grew out of the same behavior giving rise to his BMP-sleeping the wrong way on his bed. Furthermore, Trammell was able to receive a blanket and mattress after 48 hours if he stopped his misbehavior. Gillis could not regain his bedding while he was in the program, nor could he make the BMP stop once it was activated. Trammell never was denied all of his clothing. He was allowed one pair of undershorts-which, while probably not significant as to warmth, is significant as to dignity.

*Gillis,* 468 F.3d at 493-94 (citing 338 F.3d 155 (2d Cir. 2003)).

This comparison demonstrates that when a prison is facing a recalcitrant and uncontrollable inmate, it has a freer hand to take steps to impose discipline and ensure the inmate's own safety without running afoul of the Eighth Amendment. What may be considered cruel and unusual in one case may be acceptable in another, so long as the conditions imposed have some legitimate coercive and penological purpose and are linked to correcting the behavior in question. Under the circumstances of this case, the conditions imposed were not so much "punishment" as a means of protecting the inmate himself. The defendants complain, reasonably, that Bowers wants to have it both ways. If they left him alone, he could sue them for allowing him to injure himself. But if they place him in restraints, he sues them for that as well. The State has a custodial duty to take steps to restrain self-abusive inmates, and the Eighth Amendment does not allow an inmate to create a danger to himself and then sue the State when it restrains him to protect him from that danger.

For example, in *Hope v. Pelzer,* the Supreme Court addressed the case of an inmate who was hitched to a post and left in the hot sun. The court recognized that such harsh treatment could be justified if the circumstances demanded it (for example, an emergency), but found such circumstances lacking:

Any safety concerns had long since abated by the time petitioner was handcuffed to the hitching post because Hope had already been subdued, handcuffed, placed in leg

21

irons, and transported back to the prison. . . . Despite the clear lack of an emergency situation, the respondents knowingly subjected him to a substantial risk of physical harm, to unnecessary pain caused by the handcuffs and the restricted position of confinement for a 7-hour period, to unnecessary exposure to the heat of the sun, to prolonged thirst and taunting, and to a deprivation of bathroom breaks that created a risk of particular discomfort and humiliation.

536 U.S. at 738.

In contrast, the conditions imposed in this case were, for the most part, particularized to meet the security and safety concerns Bowers himself posed, and Bowers' own conduct demonstrated that those concerns were ongoing and trenchant. One of the harsher conditions Bowers suffered – the lack of a mattress, for instance – only emerged after he began harming himself with that very mattress. The BAP was frequently reviewed with the purpose of coercing Bowers into more proper behavior, and ultimately Bowers was given many of the comforts available to a typical inmate (regular clothing, etc.).[7]

Bowers contends, however, that placing him in restraints for as long as twelve hours any time he threatened to harm himself, or after he was returned from the hospital for treatment for self-inflicted injuries, smacks of punishment rather than prevention of further harm. But given his repeated efforts to harm himself, even as he was being returned to his cell following a trip to the hospital (Pollard Aff., Ex. G), it was reasonable to believe he would return to such behavior if not restrained. Indeed, given his history, it would have been reasonable to restrain Bowers continuously until he showed a willingness to stop harming himself if it could have been humanely accomplished

---

[7]It should be clarified that I am not suggesting that Bowers held the "keys" to his confinement in his own hands and thus is solely responsible for the conditions of that confinement. *See Rodriguez v. Briley,* 403 F.3d 952 (7th Cir. 2005). Though the BAP was subject to ongoing review and was ameliorated after periods of good conduct, Bowers did not have the power to end the BAP solely through his own actions.

22

by preventing the use of his hands while otherwise safely permitting movement of other parts of his body. Apparently, straitjackets are not among the tools available to corrections officers, however, and instead, uncontrollable inmates who engage in self-mutilation are essentially strapped down to a bed. A DOC regulation reasonably limits the amount of time an inmate can be restrained in such a manner to twelve hours absent a second evaluation by a licensed psychologist, or a psychiatrist, and a member of the medical staff, as well as notice to the Administrator of the DOC's Division of Adult Institutions. Wis. Adm. Code § DOC306.11(3)(e). It was presumably for this reason that Bowers was never kept in RIPP restraints for longer than twelve hours, not because he was no longer a threat to himself. Moreover, the mere fact that Bowers did not enjoy being restrained does not make it punishment. His dislike of being restrained provided an incentive for him to stop abusing himself and placing objects in his urethra and rectum. It is noteworthy that he generally did not resume his self-abusive behavior immediately after he was released from restraints. And once the BAP was changed in April to require placement in RIPP restraints each time he threatened to, or succeeded in harming himself, the incidence of self-abuse declined. (Def.'s Second Reply Br. at 8-9.) Thus, the restraints seemed to have had a deterrent and, therefore, beneficial effect. At some point, the lines between what is punishment and what is prevention can blur. Under the circumstances presented here, the use of RIPP restraints as called for in the BAP was not cruel and inhuman, but a reasonable response to Bowers' self-destructive and dangerous behavior.

Bowers' appointed counsel focuses the argument on Bowers' mental health treatment. Counsel suggests that the defendants violated Bowers' Eighth Amendment rights by failing to provide him adequate mental health treatment. That was not a part of his complaint, however, and thus not a basis on which the defendants moved for summary judgment. No motion to amend and

add a claim for denial of mental health treatment was ever filed. Bowers' *pro se* submission to the court, dated February 10, 2009, also indicates that he views this as a "conditions of confinement" case rather than a "deliberate indifference" case based on failure to treat a mental health condition. Accordingly, I do not view the mental health issue as being properly before me. Moreover, counsels' argument on the point is conclusory. The issue of proper mental health treatment would presumably require experts and other evidence rather than reliance on the bare assertions of counsel and citations to other cases. Counsel offers no evidence of what care could reasonably have been provided to Bowers that was not. There is no reason to believe that WRC would have been any more successful in protecting Bowers from himself, or used any less drastic measures, than GBCI. Thus, even if the issue was properly before me, Bowers offers no evidence that the defendants were deliberately indifferent to his serious mental health needs.

The most troubling aspect of Bowers' treatment is the fact that he was left naked, even when he was in five-point RIPP restraints, and not released when he needed to use a toilet. The defendants emphasize that everything they did was intended "to ensure Bowers's safety and well-being, as well as other inmates and staff, and to protect the security of the institution" (Def.'s PFOF ¶¶ 140-46), and the record supports their contention. It is clear from the evidence submitted that the defendants were trying to make sure Bowers was not injured as they attempted to prevent him from harming himself and others, including prison staff. Bowers has offered no evidence to cast doubt on Dr. Hamilton's statement that "I did not and do not believe that the Behavior Action Plan posed a substantial risk of serious harm to inmate Bowers's physical health or safety." (Hamilton Aff. ¶ 76.) But it is important to remember that the Eighth Amendment protects more than an inmate's physical health and safety. It also protects his dignity as a human being, even when, as in

24

this case, the inmate engages in conduct that makes such dignity difficult to recognize. *Trop v. Dulles*, 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) ("The basic concept underlying the Eighth Amendment is nothing less than the dignity of man."); *Hope v. Pelzer*, 536 U.S. at 738 ("The use of the hitching post under these circumstances violated the 'basic concept underlying the Eighth Amendment [, which] is nothing less than the dignity of man.' ") (quoting *Trop*, 356 U.S. at 100)).

Even accepting, as I have found, that using five-point RIPP restraints was a reasonable response to Bowers' self-abusing behavior, the defendants have offered no explanation for why he was kept naked while restrained.[8] Nor have they provided a reasonable explanation for why he was left to urinate and defecate on himself, instead of being taken to a bathroom. One can understand why clothing and bedding, even a mattress, may not be immediately restored to an inmate who continually destroys them or appears suicidal and has used them to cause harm to himself.[9] While the inmate may feel cold and uncomfortable, even if the cell is maintained at more than 70 degrees, such discomfort does not seem too great a price to pay for his safety. But once an inmate is tied down to a bed, he is incapable of using articles of clothing or a blanket to harm himself or others. The defendants have offered no justification for forcing him to lie naked for up to twelve hours.

---

[8]It is clear from the DVDs showing Bowers being place in restraints that removal of his clothes may have been necessary in order to allow medical staff to clean and treat injuries he inflicted on himself or received while resisting correctional officers during forced cell extraction. But once these tasks were accomplished, there appears no reason to force him to remain naked. Staff could at least cover him with a blanket.

[9]Bowers also used such items to cover the window to his cell and to pull down sprinkler heads, thereby causing flooding in his cell. (Breen-Smith Aff., Ex A 000320; Ericksen Aff., Ex. Q.)

25

Nor have they offered a reasonable explanation for denying him access to a bathroom to relieve himself instead of leaving him to urinate and defecate on himself.[10]

Forced nudity can degrade and humiliate a prisoner. Refusing to allow him the use of a toilet so that he urinates or defecates on himself adds to the degradation. Absent a justification for such conditions, I am unable to say that they do not fall within the meaning of cruel and unusual punishment proscribed by the Eighth Amendment. And unlike Bowers' allegation that insects were allowed to crawl on and bite him while he was restrained, the forced nudity and denial of use of a toilet appear to be conditions of which at least some of the defendants would have been aware. On the record before me, I am unable to determine whether, under the circumstances of this case, these conditions fall below Eighth Amendment standards. I therefore turn to the second element of the claim – whether the defendants denied Bowers civilized conditions of confinement intentionally or recklessly.

In connection with this issue, it bears repeating that the undisputed evidence demonstrates that the defendants acted with the intent to protect Bowers' physical safety and well-being, as well as to preserve internal order and discipline and maintain security. There is no evidence the defendants acted with the intent to cause wanton harm or humiliation to Bowers. Faced with a similarly recalcitrant, but less self-abusive, inmate, the Second Circuit observed in *Trammell*:

---

[10]The DOC regulation governing the use of mechanical restraints provide that "[i]f possible, staff may release an inmate from restraints to perform bodily functions and for meals." Wis. Adm. Code § DOC 306.11(3)(c). The regulation also requires that "[t]hree staff members, one of whom is the security supervisor, shall be present at the time of release." *Id.* It may have been that Bowers was too unruly to release, or staff were too busy on other duties to accommodate Bowers, or that he never asked. While these are possible justifications for leaving him in restraints, the defendants have not offered any of them in response to Bowers' allegations.

26

Consequently, we ask not simply whether the December 16 Order was imposed with "deliberate indifference" to Trammell's health and safety, for it is indisputable that the Order was intended to make Trammell uncomfortable in an effort to alter his behavior. Rather, we consider whether the Order was reasonably calculated to restore prison discipline and security and, in that purposive context, whether the officials were deliberately indifferent to Trammell's health and safety.

*Trammell,* 338 F.3d at 163 (2d Cir. 2003). The *Trammell* Court concluded that the challenged order, "while indeed onerous, even harsh, was reasonably calculated to correct Trammell's outrageous behavior." *Id.*

Likewise in this case, despite Bowers' continuing efforts to abuse himself and to injure or taunt prison staff, the conditions imposed on him did not rise to the level of a denial of life's necessities or result in the wanton or unnecessary infliction of pain. At most, they deprived him of some dignity. Because the conditions of confinement were imposed not to cause unnecessary harm to the plaintiff but to prevent his self-abusive behavior and protect him from himself (which they actually appear to have accomplished to some extent), it cannot be said that the defendants acted with deliberate indifference to his well-being and safety. In fact, it is worth reiterating that had the defendants acted differently – e.g., by allowing Bowers more property in his cell or not using restraints on him – they could have violated their custodial duty to protect an inmate in their care and subjected themselves to a lawsuit for deliberate indifference on that basis.

In essence, the defendants faced a dilemma with no easy options. It was as if for some nine months they were facing a hostage crisis in which the same person occupied the position of both victim and perpetrator. Bowers insisted that the prison staff accede to his demands – a transfer, a change of cells, a longer period for writing, the return of property, etc. – or he would harm himself. Obviously, prison officials cannot negotiate with an inmate concerning such matters and allow him

27

that kind of power and control. Yet, the prison staff was unable to rescue the hostage. Because the threatened hostage was the same person as the threatening perpetrator, they could not be separated. It was impossible to deny the perpetrator access to his hostage. The defendants were left with the almost impossible task of trying to protect a man from himself twenty-four hours a day and seven days a week. Their efforts to do so, even if at times mistaken and perhaps even counter-productive, reflect not indifference but tremendous concern for Bowers' care and safety, far more than he had for himself. It is difficult to imagine any institution on earth, penal or not, that could or would be expected to expend as much time, effort and resources to protect a person from himself. Indeed, it is the prison staff's very concern for Bowers' physical safety that, in his mind, gave him so much power over them.

Clearly reasonable minds can debate the efficacy of Bowers' treatment or whether the BAP was the best way to ameliorate the behavior of an inmate like Bowers. But before me is the question of whether there exists evidence from which a jury could conclude that the defendants acted intentionally or recklessly to subject Bowers to conditions constituting cruel and unusual punishment. I conclude that there is not. Accordingly, summary judgment will be granted as to Bowers' Eighth Amendment claim.

**B. Due Process**

In addition to his Eighth Amendment claim, Bowers was allowed to proceed on a fourteenth Amendment claim for denial of procedural due process. To prevail on such a claim Bowers must establish that he had a liberty interest in not being placed in his BAP without notice and an opportunity to be heard. Under *Sandin v. Conner,* 515 U.S. 472, 484 (1995), prison discipline that involves "atypical and significant hardship in relation to ordinary incidents of prison life" gives rise

28

to such an interest under the Fourteenth Amendment's Due Process Clause. Thus, in order to constitutionally impose such discipline, prison officials must provide the inmate with due process. Bowers claims he was denied due process before he was placed in the BAP and subjected to the other restrictions noted above.[11]

The main problem with Bowers' due process claim, however, is that the conditions he complains of were not imposed so much to punish him, as to protect him from himself. *Sandin* applies to prison discipline, not measures instituted for the protection of the inmate. 515 U.S. at 486 ("We hold that Conner's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest."). The most extreme conditions occurred when Bowers was placed in Observation after attempting to injure himself, or when he was placed in restraints. Thus, counsel complains that "during his first four days at GBCI, November 14 through November 18, 2005, Mr. Bowers was placed in Observation Status on a cold cement floor without a mattress or a blanket, wearing only a paper gown." (Pl.'s Br. In Opp. at 4.) But as noted above, Observation Status is "an involuntary or voluntary nonpunitive status to be used for temporary confinement of an inmate to ensure the inmate's safety and the safety of others if the inmate is mentally ill and dangerous, dangerous to himself or herself, has a medical problem that requires separation from the population for treatment, or refuses treatment for a communicable illness." Wis. Adm. Code s DOC 311.01.

The fact that the most severe conditions imposed on him were intended to protect Bowers from himself, as opposed to punish him for past infractions, is significant. Unlike punishment that is imposed for past behavior, the need to prevent an inmate from harming himself requires

---

[11]Appointed counsel has not pressed this argument.

29

immediate action. Prison staff would be seriously derelict in their duties if, upon observing an inmate attempting to hang himself with his own clothing, they gave him notice of a future hearing to determine whether his clothing and bedding should be taken away from him. Likewise with respect to the decision to use restraints, when an inmate swallows parts of a sprinkler head, bangs his head repeatedly against a wall, or places a pen insert, an orange peel or his own finger nails into his urethra, the need to immediately restrain him outweighs concern for his procedural rights.

This is not to say that prison guards can unilaterally and indiscriminately place an inmate in an observation room and take away his clothes and all his property, or place him in five-point restraints for indefinite periods of time, so long as they claim it is for the prisoner's own good. But, of course, that is not what occurred here. DOC regulations limit the authority of prison staff to place inmates in Observation Status. Although any staff member can recommend placement on Observation, placement may be made only by a clinician, crisis intervention worker, physician, or the warden. Wis. Adm. Code § DOC 311.04(4)(a) and (b). If a clinician, crisis worker, or physician is not available for consultation either directly or by phone, a registered nurse, physician's assistant, the security director or shift captain can also make the decision to place an inmate on Observation. § 311.04(4)(c) and (d). The inmate must be orally informed of the reasons at the time placement is made, § 311.04(6), and unless a clinician, crisis intervention worker or physician ordered the placement based on a direct personal examination and review of relevant information, he must be immediately notified and conduct such an examination within two working days. The inmate is orally advised of the results of the examination within twenty-four hours and provided a written report within ten days. § 311.04(3). The determination of what privileges and property are to be provided an inmate on Observation Status is made by a clinician, crisis intervention worker or

30

physician, with final review by the warden. Wis. Adm. Code § DOC 311.14(2) and (4). Finally, no inmate may remain in Observation Status for more than fifteen days unless the inmate is afforded notice and an evidentiary hearing. § DOC 311.09.

The authority of prison staff to use restraints is even more strictly circumscribed. Mechanical restraints to immobilize an inmate may be used only on the express authorization of the shift supervisor and only for protection of persons, including the inmate, or property. § DOC 306.11(1). Upon authorizing use of such restraints, the shift supervisor must notify the psychologist and a member of the medical staff, who then interview the inmate and arrange for a physical and mental examination as soon as possible. They then make recommendations to the warden concerning the inmate's continued placement in restraints, and the warden evaluates the recommendations and decides whether the inmate should remain in restraints. § DOC 306.113(3)(a). If the restraints are continued, a staff member observes the inmate every fifteen minutes, and detailed records are kept. § DOC 306.11(3)(b) and (d). The inmate cannot be kept in such restraints more than twelve hours unless the inmate is again examined by the psychologist and medical staff and the administrator of the Division of Adult Institutions of the DOC is notified. § DOC306.11(3)(e).

The procedures mandated by the DOC regulations and followed here are sufficient to satisfy the requirements of due process. The Supreme Court has held that "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471 (1972); *see also Wilkinson v. Austin*, 545 U.S. 209, 228-30 (2005). The framework established by the Court to evaluate the sufficiency of particular procedures requires consideration of three distinct factors:

31

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Matthews v. Eldridge*, 424 U.S. 319, 335 (1976). Consideration of those factors here confirms that the DOC procedures are constitutionally adequate.

With respect to the first factor, the Court has observed that "[p]risoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." *Wilkenson*, 525 U.S. at 225. Added to this consideration is the fact that in this case the challenged actions were intended to prevent the inmate from causing serious injury, even death, to himself. This is especially relevant in a case such as this where the inmate has a long history of self-inflicted injury. Given the risk to the inmate's physical safety if he is not restrained or placed in Observation Status, it seems clear that the inmate's interest in avoiding an erroneous determination that he is in need of such measures is even more limited than in cases involving inmate discipline.

"The second factor addresses the risk of an erroneous placement under the procedures in place, and the probable value, if any, of additional or alternative procedural safeguards." *Wilkenson*, 545 U.S. at 225. In light of the reasons that give rise to placement in Observation Status or RIPP restraints, it would appear that the risk of erroneous placement under the existing procedure is low. Here, for example, Bowers actions were immediately apparent to prison staff. Indeed, Bowers intentionally engaged in his self-abusive conduct in the presence of staff in order to force a

32

response.  This is not a situation in which staff are tasked with sifting through evidence to uncover a past offense and determine an appropriate punishment.  The facts that justify placement in Observation Status or restraints were immediately apparent, as was the need for immediate action. And the requirement of supervisory authority to effect the placement and the requirement for immediate professional evaluation of the inmate's mental and physical condition insures that such measures are implemented safely and only when warranted.  It is difficult to think of any alternative procedural safeguards that would reduce the risk of error and still effectively meet the need for a rapid response.

The third and final consideration is the State's interest.  This includes that State's obligation "to ensure the safety of guards and prison personnel, the public, and the prisoners themselves." *Wilkenson,* 545 U.S. at 227.  It also includes consideration of the limited resources available to the State to fulfill its obligation to securely and safely house a growing inmate population, as well as the increasing costs of providing medical and mental health care and treatment.  *Id.* at 228.  Added to these considerations is the current state of the law under which the family of an inmate can recover damages for the inmate's death if the family can convince a jury that the prison officials were "deliberately indifferent" to the serious risk of suicide.  *See, e.g. Matos v. O'Sullivan*, 335 F.3d 553 (7th Cir. 2003).  In light of these considerations, the State has a strong interest in having a procedure that permits quick action to prevent an inmate from injuring himself or others.

Based on a consideration of all three *Matthews* factors, it is clear that the DOC regulations governing placement of inmates in Observation Status and the use of mechanical restraints are sufficient to satisfy due process.  Accordingly, summary judgment will be granted on this claim as well.

33

## C. Remaining Motions

Bowers has recently filed a motion seeking a temporary restraining order. He has filed the motion on his own rather than under the signature of his appointed counsel. That alone makes it improper. Even if it were not improper, the motion does not set forth relief that can be granted in this case. It alleges an incident in the shower that occurred on February 25, 2009, and thus is not related to the claims alleged in this case. Moreover, the motion does not set forth any basis for emergency relief. Accordingly, it is denied.

Finally, and not surprisingly in light of the fact that Bowers has continued to file his own pleadings reflecting a fundamental disagreement with appointed counsel over how the case should be handled, counsel has filed a motion to withdraw and requests to be relieved of the appointment. Having concluded that the defendants' motion should be granted, and given the break-down in the attorney-client relationship, I see no reason not to grant counsel's motion. At the same time, the Court wishes to publicly express its gratitude to counsel and the members of his firm the for the time, effort and resources they dedicated to this matter pro bono.

## III. CONCLUSION

For the reasons set forth above, the motion for summary judgment is **GRANTED**, as is counsel's motion to withdraw. The motion for a TRO is **DENIED**.

**SO ORDERED** this __17th__ day of March, 2009.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

34